# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS
OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR
CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN
UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A
COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG
WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO
THE ACTION.

RENDERED: MARCH 14, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0506-MR

TYRONE RAEHME                                                         APPELLANT

V.                  ON APPEAL FROM HARDIN CIRCUIT COURT
                    HONORABLE KELLY M. EASTON, JUDGE
                    NO. 21-CR-00927

COMMONWEALTH OF KENTUCKY                                               APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Shortly after midnight on September 16, 2021, Tyrone Raehme drove the wrong way down a divided highway and crashed head-on into another vehicle, killing Tonya Kelly. A Hardin Circuit Court jury convicted Raehme of wanton murder, wanton endangerment, trafficking in synthetic drugs, driving under the influence (DUI), and driving without insurance. The trial court sentenced Raehme to a total of twenty years in prison in accordance with the jury's recommendation. Raehme now appeals as a matter of right, raising several issues. For the following reasons, we affirm the judgment of the Hardin Circuit Court.

## FACTS AND PROCEDURAL HISTORY

Tyrone Raehme drove the wrong way on Dixie Highway, a divided highway which he claimed to know well because he grew up in the area, drove on the highway often, and often took it to get to work. Raehme turned onto the southbound lanes of Dixie Highway instead of the northbound ones. He drove the wrong way for about one mile and claimed he did not notice any of the indicators that could have alerted him he was driving the wrong way, such as the backward facing signs, buildings being farther away than normal, or the traffic lights. At trial, other drivers testified to flashing their lights and honking their horn at Raehme in an attempt to alert him to what he was doing.

Two cars going the correct way in the southbound lanes approached Raehme's car. The driver in the first car, Lorie Stone, saw Raehme's car coming towards her and pulled into a turning lane. The second car, driven by Tonya Kelly, was traveling behind Stone. Kelly sped up and switched lanes to pass Stone and Raehme collided with her head on.

When an officer arrived on the scene, Kelly was trapped in her car but alive. The officer observed Raehme trying to find his driver's license, stumbling, and possibly slurring some of his words. At first, Raehme told the officer he had not had anything to drink that night or taken any drugs. Plus, Raehme believed he was driving in the northbound lanes before he lost control of his car and crossed over the grass median into the southbound lanes. A little later, Raehme changed his story and stated he drank one beer that night. A breathalyzer was not performed at the scene, in part because the officers and

emergency medical personnel were concerned for the safety of everyone involved, but the officer testified that there was a weak smell of alcohol from Raehme. Additionally, an EMT testified similarly and noted the smell of alcohol was stronger in the confined space of the ambulance while he transported Raehme to the hospital.

The officer attempted to locate Raehme's driver's license and proof of insurance. In doing so, the officer found trash, including beer cans and empty vodka bottles, $400 in cash, and what turned out to be 184 grams of synthetic marijuana. The officer arrested Raehme at the hospital as he tried to check himself out against medical advice. Given the various indications that Raehme was driving under the influence, the officer ordered a blood draw which was performed a little under three hours after the collision. The blood testing revealed a blood alcohol level of 0.074 plus or minus 0.005 and that Raehme had marijuana and synthetic marijuana in his system.

At trial, the Commonwealth presented an expert witness, Dr. Gregory Davis, who back extrapolated the data to offer some possibilities of what Raehme's blood alcohol level was at the time of the collision. Dr. Davis opined that Raehme's assertion that he only had one beer was medically impossible given his blood alcohol level at the time of the blood draw. To get a blood alcohol level of 0.069 (the lowest level possible at the time of the blood draw), Raehme would have had to drink about two and two-thirds bottles of beer. But his blood alcohol level would have likely been higher almost three hours earlier. Dr. Davis also presented hypotheticals, in which he estimated Raehme's blood

3

alcohol content at the time of the collision could have been between 0.089 and 0.109. Ultimately, Dr. Davis could not state how intoxicated Raehme was when he collided with Kelly but opined that at the time of the collision Raehme was intoxicated to some degree by a combination of alcohol, marijuana, and synthetic marijuana.

Raehme testified in his own defense and did not dispute much of the Commonwealth's case. Raehme admitted to smoking marijuana the morning of September 15 but denied smoking synthetic marijuana that day. He also admitted that at the time of the September 16 incident, he was under a court order prohibiting him from driving. In addition, he admitted to not wearing his glasses at the time of the collision despite his driver's license requiring him to do so.

A jury convicted Raehme of wanton murder, wanton endangerment, trafficking in synthetic drugs, DUI, and driving without insurance. The jury sentenced him to twenty years for wanton murder, one year for wanton endangerment, one year for trafficking, ninety days for no insurance, and four days for DUI, all to run concurrently for a total sentence of twenty years in prison. This was the minimum sentence available. Further facts will be discussed as necessary.

Raehme appeals as a matter of right, raising seven issues for our review: whether (1) the trial court abused its discretion in admitting evidence of pending charges for wanton endangerment and driving under the influence; (2) the trial court erred in joining the trafficking charge with the remaining

4

charges; (3) the trial court improperly excluded his mental health expert from testifying about his autism spectrum disorder diagnosis, or, in the alternative, erred by refusing to grant a continuance; (4) the Commonwealth committed discovery violations; (5) the trial court erred in denying his motion for directed verdict; (6) the trial court impermissibly allowed witnesses to testify remotely in violation of the Confrontation Clause, and (7) the trial court erred by refusing to exclude all mention of Tonya Kelly's father's status as a retired Kentucky State Police trooper. After careful review, we find no error.

## ANALYSIS

### I. The trial court did not abuse its discretion in allowing pending charges into evidence.

Prior to trial, the Commonwealth filed a notice pursuant to Kentucky Rule of Evidence (KRE) 404(b) of its intent to introduce evidence of Raehme's pending charges in Jefferson County for DUI and wanton endangerment from an April 2021 incident. The Commonwealth also sought to introduce evidence of the bond condition from that Jefferson County case which prohibited Raehme from driving and from using any illegal drugs or alcohol.

In the Jefferson County case, Raehme drove his car for several miles in the wrong direction on I-65. The Commonwealth sought to introduce evidence pertaining to the pending Jefferson County charges to demonstrate that Raehme's conduct in the Hardin County case included the necessary state of mind to support the wanton murder charge. Because he was on bond in Jefferson County for two of the same types of offenses he was charged with in

5

the present case, the Commonwealth argued he was more aware than most individuals of the dangers he posed to others by operating a vehicle under the influence and driving in the wrong direction.

Raehme objected to the introduction of this evidence, arguing that the pending charges were neither relevant nor probative and that the evidence would be unduly prejudicial. Additionally, Raehme noted that the Jefferson County charges were pending and he was not convicted of anything at the time the Commonwealth sought to introduce the charges.

The trial court determined the pending Jefferson County charges were probative, citing *United States v. Merritt*, 961 F.3d 1105 (10th Cir. 2020). The trial court also reasoned the evidence could be relevant to any claim of accident or mistake offered to counter the claim of wanton behavior. Additionally, the trial court recognized the potential prejudicial impact of the evidence but reasoned that such danger could be adequately addressed with a proper instruction to the jury. The trial court allowed the Commonwealth to introduce the evidence of the Jefferson County charges and prior to its introduction Raehme renewed his objection. Therefore, this issue is preserved. We review a trial court's decision to admit KRE 404(b) evidence for an abuse of discretion. *Anderson v. Commonwealth,* 231 S.W.3d 117, 119 (Ky. 2007). The test for abuse of discretion is "whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

During trial, the Commonwealth called two police officers to testify about the Jefferson County incident. The first officer's testimony was minimal. He stated that he received a call around 3:00 a.m. on April 25, 2021 because a driver was driving the wrong way on the interstate. The officer located the vehicle and followed it with his sirens on, primarily to alert other drivers of the dangerous situation. The officer had no interaction with Raehme during the incident. The Commonwealth played the officer's body camera footage for the jury, which merely showed the officer's pursuit of Raehme.

A second officer testified that he also received a call about someone driving the wrong way on the interstate. The officer observed another police officer attempt to stop Raehme, but Raehme disregarded the officer and almost hit him. The officer also saw Raehme pass numerous cars while traveling the wrong direction. Eventually, an off-duty police officer was able to stop Raehme.

The second officer interacted with Raehme, who explained to the officer that he just left the Jeffersonville, Indiana area and was headed home to Radcliff. The officer informed Raehme that he was traveling the wrong direction and Raehme blamed his GPS for the mistake. The officer asked whether he had anything to drink. While Raehme originally denied having anything to drink, he eventually admitted to consuming one beer. During his testimony, the officer also noted that Raehme was not wearing corrective lenses. The officer charged Raehme with driving under the influence and first-degree wanton endangerment for almost colliding with one of the officers that

7

attempted to stop him.[1]  This testimony was minimal, lasting approximately six minutes, and was appropriate because the Jefferson County incident involved pending charges, not convictions.

The Commonwealth played videos of the second officer's interactions with Raehme for the jury, during which Raehme was in the back of the police car and stated he did not know how he ended up driving the wrong direction. The officer explained to Raehme that many people drive on that interstate and stated that if Raehme had collided with someone head on, it would have likely been one of the worst accidents the officer had ever seen.  The officer also implied that had there been a collision, it likely would have resulted in Raehme's death.  The officer further explained to Raehme that a GPS does not inform a driver if they are traveling the wrong direction on an interstate. Finally, the officer also explained that one of Raehme's bond conditions from the Jefferson County case was that he was prohibited from driving.  The video clips lasted for approximately two minutes.

On cross-examination, Raehme's counsel elicited information about the signs of impairment that Raehme displayed during the Jefferson County incident.  The officer confirmed that Raehme failed several field sobriety tests, that his eyes were glossed over, and that when Raehme exited his vehicle he struggled to maintain his balance.  The cross-examination lasted approximately seven minutes.  Additionally, during closing argument, the Commonwealth

---

[1] After this statement in the officer's testimony, he continued to state that Raehme probably should have been charged with more.  Raehme objected, and the trial court sustained the objection.

argued Raehme's conduct in the present case was aggravated wantonness because he had been told five months earlier that he was driving the wrong way on I-65.

After the testimony about the Jefferson County incident concluded, the trial court gave the jury a limiting instruction. The trial court explained that the Jefferson County charges could not be used as evidence that Raehme was impaired in the Hardin County case but could be used for assessing his state of mind. The instruction specifically stated that

> [e]vidence of a prior event may not be considered as evidence to prove guilt of a similar event happening on a later date. . . . In this case, the defendant's state of mind on September 16th of 2021 is a question you jurors will determine. If you chose to do so, you may consider the Defendant's knowledge of the events on April 25th of 2021 and the conditions of his bond with respect to any charges relating to that event only for the purpose of assessing his state of mind on September 16th of 2021 and for no other purpose.

Raehme argues this KRE 404(b) evidence was unduly prejudicial. KRE 404(b) provides that, generally, evidence of other crimes or wrongs is not admissible to prove the character of a person in order to show conformity therewith. However, such evidence may be admissible "[i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" KRE 404(b)(1). KRE 404(b) is "exclusionary in nature" and the exceptions "should be closely watched and strictly enforced" given their "dangerous quality and prejudicial consequences." *Graves v. Commonwealth,* 384 S.W.3d 144, 147-48 (Ky. 2012) (quoting *Clark v. Commonwealth,* 223 S.W.3d 90, 96 (Ky. 2007)).

9

To determine whether evidence of other bad acts is admissible under KRE 404(b), the Court must consider relevance, probative value, and prejudice. *Bell v. Commonwealth,* 875 S.W.2d 882, 889 (Ky. 1994). First, the Jefferson County incident was relevant. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. In this case, Raehme was charged with wanton murder, which means the Commonwealth had to prove that he "acted wantonly and with extreme indifference to human life[.]" *Pozo-Illas v. Commonwealth,* 671 S.W.3d 118, 136 (Ky. 2023). "A person acts wantonly . . . when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists." *Id.* (quoting Kentucky Revised Statute (KRS) 501.020(3)). Because of these statutory requirements, Raehme's state of mind was critical, and evidence of the Jefferson County incident supported the contention that Raehme had knowledge of the dangerousness of his conduct in Hardin County on September 16th.

The Commonwealth offered evidence of the Jefferson County incident to show Raehme's state of mind on September 16th. That evidence indicated that Raehme was explicitly warned that he could have gotten into a terrible accident because of his behavior—one that would have likely resulted in death. Raehme's state of mind was the critical issue in the case, given he did not dispute many of the facts of the incident. He never disputed that he was

10

driving the car during the September 16th incident, but rather admitted that he used his GPS and inadvertently turned left on what he believed was a two-way road. He admitted to driving the wrong way and striking Tonya Kelly's vehicle. He also admitted that he knew Dixie Highway well and admitted in retrospect that there were several indicators that he was going the wrong way. He also admitted he was under a court order prohibiting him from driving and that he was not wearing his glasses.

The critical issue in the case was Raehme's state of mind and it was the Commonwealth's burden to introduce evidence to support the charged conduct. The evidence that, a mere five months prior to the charged incident, Raehme engaged in similar conduct and was explicitly warned of the dangers that conduct posed undoubtedly made it more probable that he knew of and consciously disregarded the substantial risks of driving under the influence in the wrong direction on a busy highway, and that such conduct constituted an extreme indifference to human life.

Next, the evidence of the Jefferson County incident was probative. "[E]vidence of other bad acts is sufficiently probative if 'the jury could reasonably infer that the prior bad acts occurred and that [the defendant] committed such acts.'" *Howard v. Commonwealth,* 595 S.W.3d 462, 476 (Ky. 2020) (quoting *Parker v. Commonwealth,* 952 S.W.2d 209, 217 (Ky. 1997)). There was ample evidence presented to allow the jury to reasonably infer that the Jefferson County incident occurred and that Raehme drove the wrong way down a busy interstate for several miles. Both officers provided sworn

11

testimony about the incident, explained the multiple attempts to stop him, and how he failed field sobriety tests and exhibited behavior indicating he was intoxicated. Additionally, the jury could see some of the prior acts directly through the officers' body camera footage. Again, we note that the officers' testimony was appropriate given that the Jefferson County incident involved charges, not convictions, and because Raehme's interactions with the second officer demonstrated that Raehme was explicitly warned of the dangers this type of conduct posed.

Finally, we must weigh the prejudicial nature of the evidence against its probative value. *Bell,* 875 S.W.2d at 889. Evidence of other crimes, wrongs, or acts is "inherently and highly prejudicial to a defendant" because "[i]t is very difficult for jurors to sift and separate such damaging information to avoid the natural inclination to view it as evidence of a defendant's criminal disposition." *Id.* at 890. We must consider "the probative worth of the evidence, the probability that the evidence [caused] undue prejudice, and whether the harmful effects substantially outweigh[ed] the probative worth." *Yates v. Commonwealth,* 430 S.W.3d 883, 897 (Ky. 2014) (citing *Barnett v. Commonwealth,* 979 S.W.2d 98, 100 (Ky. 1998)).

The Jefferson County incident evidence was undoubtedly prejudicial. But we must determine whether that prejudice was "unnecessary and unreasonable." *Price v. Commonwealth,* 31 S.W.3d 885, 888 (Ky. 2000). At trial, the Commonwealth presented a considerable amount of evidence demonstrating that Raehme committed the crimes for which he was charged in

12

Hardin County, and that he did so with the requisite state of mind to constitute wanton murder. Driving the wrong way down a highway, even if not driving while impaired, creates a significant and unjustifiable risk to other drivers on the road. The Jefferson County evidence showed that in the present case Raehme decided to drive under the influence the wrong way despite being under a court order not to drive. Simply put, evidence that Raehme engaged in the same conduct months prior and was explicitly warned of its dangerousness supported the Commonwealth's assertion that he was aware of and consciously disregarded the attendant risks during the Hardin County incident. Additionally, the trial court provided a limiting instruction to "reduce the possibility of prejudice to an acceptable level." *Leach v. Commonwealth,* 571 S.W.3d 550, 557 (Ky. 2019).

In *Merritt,* which the trial court cited in its order allowing introduction of the Jefferson County incident evidence, the defendant was intoxicated while driving in the wrong lane in August 2016 and collided with another vehicle, killing one of its passengers. 961 F.3d at 1108. He was charged with second-degree murder and assault. *Id.* The government offered evidence of a DUI conviction from two years prior and an arrest from four years prior for intoxication and violation of applicable liquor laws, for which the defendant ultimately pled guilty. *Id.* at 1111. The purpose of introducing evidence of these prior incidents was to prove the defendant knew his conduct in the incident before the court posed a serious risk of death or harm to himself or others, but that he disregarded that risk. *Id.* at 1111-12.

13

After concluding the evidence of the prior incidents was offered for a proper purpose, the Court conducted a balancing test to weigh probative value against unfair prejudice. *Id.* at 1115. While recognizing that the evidence was undoubtedly prejudicial, the Court reasoned that the evidence was highly probative of the defendant's state of mind. *Id.* Ultimately, the Court upheld the lower court's admission of the evidence. *Id.* at 1116. The Court explained that the defendant driving the wrong way down a busy highway could have resulted in numerous deadly accidents, and the signs of intoxication the defendant exhibited supported an inference that he was aware his ability to operate a vehicle while drunk was gravely compromised. *Id.* Most importantly, the evidence "support[s] the inference that although Merritt was cognizant his drunk driving posed a significant risk of death to others, he simply did not care because he drove in an intoxicated state once again in August 2016." *Id.* Further, the lower court did not abuse its discretion in concluding the similarities between the two prior convictions and the August 2016 incident "make it less probable that Mr. Merritt's decision to drive while intoxicated in this instance was unwitting or simply a one-off." *Id.* at 1113.

This rationale from *Merritt* is directly applicable despite Raehme's attempt to distinguish it. Kentucky caselaw states that "[p]revious DUI convictions do not fall within either the exceptions outlined by KRE 404(b) or those recognized by this Court." *Commonwealth v. Ramsey,* 920 S.W.2d 526, 528 (Ky. 1996) (introduction of a prior conviction for DUI was unduly prejudicial). *See also Commonwealth v. Pace,* 82 S.W.3d 894 (Ky. 2002)

14

(introduction of prior DUI conviction was error, but not palpable error). But these cases involved the introduction of prior DUI convictions in cases in which the defendant was presently charged with DUI. *Ramsey* and *Pace* both involved charges of DUI and driving with a suspended license, and *Pace* involved additional charges pertaining to the use of an all-terrain vehicle. While, in this instance, Raehme was charged with DUI in the Jefferson County incident and was also charged with DUI in the present case, the purpose of introducing the evidence in the present case was for the wanton murder charge, not the DUI charge. Raehme also emphasizes that the Jefferson County incident involved pending charges and he had not been convicted of any crime. However, "[a] conviction is not required for evidence of another crime to be admissible." *Leach,* 571 S.W.3d at 556.

As in *Merritt,* the evidence of other crimes or acts is not limited solely to the fact of the existence of pending charges. "Indeed, if the government had *only* been permitted to inform the jury of Merritt's record—stripped of any details—the only inference that arises is an impermissible one: Merritt has a propensity to drive while intoxicated, and he acted in accordance with this character trait when he killed [the victim]." 961 F.3d at 1113. The evidence demonstrates that Raehme was clearly aware of the dangers he posed to others by driving the wrong direction on an interstate or highway. His choices, and thus state of mind, exhibited precisely the kind of indifference that the Commonwealth was tasked with proving to obtain a wanton murder conviction. As such, although the evidence of the Jefferson County incident was prejudicial

15

to Raehme, that prejudice was not unnecessary nor unreasonable. *Price,* 31 S.W.3d at 888. Therefore, the trial court did not abuse its discretion in admitting evidence of the Jefferson County incident to allow the Commonwealth to prove Raehme's state of mind during the Hardin County collision.

**II.** **The trial court did not err by denying Raehme's motion to sever the trafficking charge from the remaining charges.**

Next Raehme argues that the trial court erred in refusing to sever the trafficking in synthetic drugs charge from the remaining charges. After officers arrived on the scene, Raehme was stumbling and looking around in his car. He told an officer he was trying to find his driver's license. Raehme was unsuccessful, so an officer looked in his car to find his license but instead found 184 grams of synthetic marijuana and $400 cash.

Before trial, Raehme filed a motion to sever the trafficking charges from the other charges and argued it was not related to the collision. The trial court denied his motion, reasoning that "[t]he allegation of trafficking is related to [Raehme's] own use, and that alleged use is relevant to the DUI and to wanton murder." The trial court also noted the low bar for relevance and explained that trafficking drugs would have "some tendency" to prove that someone "may have used some of the trafficked substance that is in their car with them that day." Further, the trial court reasoned that even without the trafficking charge, all the evidence relating to the synthetic marijuana would be admissible for the other charges.

16

Because this issue is preserved, we review for an abuse of discretion. *Quisenberry v. Commonwealth,* 336 S.W.3d 19, 26 (Ky. 2011). The test for abuse of discretion is "whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English,* 993 S.W.2d at 945.

Rule of Criminal Procedure (RCr) 6.18 allows joinder of charges in an indictment if they are of like character, part of a common scheme, or if they "are based on the same acts or transactions connected together[.]" Joinder is proper if the evidence shows a sufficient "nexus" or "logical relationship" between the crimes charged. *Peacher v. Commonwealth,* 391 S.W.3d 821, 837 (Ky. 2013). If the defendant will be prejudiced by joinder of offenses, RCr 8.31 mandates that the trial court "shall order separate trials of counts[.]" In determining whether joinder resulted in undue prejudice, we consider "whether evidence necessary to prove each offense would have been admissible in a separate trial of the other." *Peacher,* 391 S.W.3d at 838 (quoting *Roark v. Commonwealth,* 90 S.W.3d 24, 28 (Ky. 2002)).

Here the synthetic marijuana was found in Raehme's vehicle—the vehicle he just used to drive the wrong way down a highway and the vehicle that was involved in a fatal collision. Raehme exhibited signs of impairment according to the assisting officer's testimony, such as slurred speech and stumbling. Raehme also changed his story, first stating he had not drunk anything or taken any drugs, but eventually admitting to having one beer. In addition, Raehme explained to the officer that he thought he lost control of his car and

17

crossed over the grass median into the southbound lanes, causing the collision, when in fact he caused the collision by driving in the wrong direction down the divided highway. The accident occurred on the wrong side of the road and multiple people smelled alcohol on Raehme.

The trafficking charge stemmed from the same set of facts and occurrence as the fatal collision, thus creating a sufficient nexus between the trafficking evidence and evidence of the other crimes charged. The discovery of the synthetic marijuana and cash in Raehme's car occurred immediately after the collision. In addition, during his trial testimony, Raehme admitted to selling synthetic marijuana. The primary points Raehme contested at trial were that he was driving while impaired and that he was speeding. Therefore, the discovery of the synthetic marijuana was relevant to the other charges and the trial court did not abuse its discretion in allowing all charges to be tried together.

### III. The trial court did not err by excluding Dr. Bundy's mental health testimony or by denying Raehme's motion for a continuance.

In November 2021 the trial court granted defense counsel's motion for funding to consult a mental health expert but defense counsel never actually consulted an expert. On July 11, 2022, Raehme filed a motion for funds for a mental health expert, Dr. Myra Bundy, to evaluate him for autism. Defense counsel explained that during a meeting with Raehme, Raehme's recently appointed co-counsel observed behaviors she believed were indicators of autism. In discussing the expert funds, defense counsel told the trial court

18

that obtaining the expert and evaluating Raehme would not jeopardize the trial date, August 1, 2022. The trial court granted the funds on July 12, 2022, and Dr. Bundy evaluated Raehme on July 19, 2022. On July 20, 2022, Raehme filed a notice of intent to call Dr. Bundy as a witness to testify during the penalty phase that Raehme is on the autism spectrum. In the notice, Raehme stated that Dr. Bundy would be a penalty phase witness only. The Commonwealth objected to the late disclosure of Dr. Bundy as a mental health expert.

The trial court conducted a hearing on the issue on July 26, 2022 and ultimately denied the motion, determining that Raehme failed to provide notice of a mental health expert more than ninety days before the scheduled trial pursuant to RCr 8.07. While that rule also permits a trial court, for good cause shown, to allow a defendant to file a late mental health expert notice or grant a continuance, the trial court concluded that Raehme had not shown good cause to either allow the late filing or to grant a continuance given all the surrounding circumstances.

Specifically, the trial court noted the defendant had not provided a written report from Dr. Bundy, and that this was the first time the issue of autism had been presented to the court. The trial court also reminded the parties that in November 2021 the trial court granted defense counsel's motion for funding to consult a mental health expert but defense counsel never actually consulted an expert. Additionally, the trial court considered the work done in preparing for trial, preserving witness testimony, and ensuring witness

19

availability, anticipating that allowing Dr. Bundy to testify would delay the trial.

Raehme moved the trial court to reconsider both the exclusion of Dr. Bundy's testimony and the denial of a continuance, this time providing a report from Dr. Bundy, but also stating that her testimony would be used for both the guilt and penalty phases. On the morning of the start of the trial, the trial court again denied the motion, reiterating its prior holdings but adding concerns over inserting the word "autism" into the case and noting Dr. Bundy's report was broader than originally explained. Additionally, the trial court noted that defense counsel originally stated Dr. Bundy's opinion would only be used during the penalty phase but now requested to introduce her testimony during the guilt phase as well.

As to the request to grant a continuance, the trial court noted the delay due to this new expert testimony would likely take months because the Commonwealth would have to obtain an expert for its own evaluations. The trial court did not believe the delay would be purposeful or caused by Raehme. However, although the case was not overly complex, there were a lot of witnesses and toxicological issues. Additionally, the court noted how many witnesses would be affected, the expense to witnesses in travel arrangements, and the mental preparation in getting ready to try the case, which the court opined was extremely difficult for a number of people. After balancing these considerations, the trial court denied the renewed motion for a continuance.

20

The trial court allowed Dr. Bundy's testimony by avowal. Dr. Bundy testified she saw Raehme twice and diagnosed him as being at a level one on the autism spectrum, which is the lowest level and has the "mildest impact." She also noted that, even within level one, there was a spectrum and certain facts, such as Raehme having friends, maintaining employment, and being able to drive, suggested he was mildly impacted by this diagnosis. Dr. Bundy was also clear that her diagnosis did not affect any determination of Raehme's criminal responsibility. She acknowledged that drug and alcohol use would exacerbate the symptoms of autism spectrum disorder.

Dr. Bundy further opined that Raehme's low visual and motor processing skills would be crucial information given the facts surrounding the September 2021 incident. However, the trial court specifically noted that Raehme was not wearing glasses, for which he has a prescription, when he took the tests before Dr. Bundy. Dr. Bundy acknowledged the need for tests with proper eyewear. Finally, Dr. Bundy concluded that while Raehme's mental defects would not absolve him of criminal responsibility, they had played a role in his life history including events leading up to his criminal behavior.

After this testimony, the trial court noted it would have been hard pressed to find that the probative value of the diagnosis outweighed the risk of undue prejudice, confusion of the issues, or waste of time. The trial court opined that, at most, Dr. Bundy's testimony may have been admissible in the penalty phase because it went more toward mitigation. We also note that after the trial ended, the trial court conducted a hearing to give parties an

21

opportunity to present further evidence and preserve the record on various issues.  In a subsequent order, the trial court again opined that, if anything, the autism diagnosis may have played a role in mitigation of penalty, but highlighted that Raehme received the minimum possible sentence from the jury.

On appeal, Raehme argues the trial court abused its discretion in excluding Dr. Bundy's testimony.  We review a trial court's evidentiary rulings for an abuse of discretion and must determine whether the trial court's decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."  *Ward v. Commonwealth,* 587 S.W.3d 312, 332 (Ky. 2019) (quoting *Goodyear Tire and Rubber Co. v. Thompson,* 11 S.W.3d 575, 581 (Ky. 2000)).

Part of the trial court's reasoning in excluding Dr. Bundy's testimony was that the trial court authorized expert funding in November 2021.  The trial court theorized that, had that evaluation been performed, any conditions affecting mitigation may have been discovered.  We agree.  Raehme had the funds, time, and opportunity to consult an expert in November 2021 but failed to do so.  Raehme argues that the reasons that led defense counsel to request funding for a psychological evaluation in November 2021 had resolved, so there was no reason to pursue an evaluation.  Defense counsel also argued that they did not realize they should evaluate for autism until June 2022 because autism was not on their radar back in November.  But this is of no consequence.  Neither of these reasons change the fact that there was ample time and sufficient funding to have the evaluation done well before the ninety-day time

22

requirement outlined in RCr 8.07. The trial court properly supported its decision to exclude Dr. Bundy as a witness and it was not arbitrary, unfair, or unreasonable. As such, the trial court did not abuse its discretion.

Raehme also argues that the trial court abused its discretion in failing to grant a continuance. This issue is preserved because Raehme moved for a continuance and that motion was denied by the trial court. We review a trial court's denial of a motion for a continuance for an abuse of discretion. *Slone v. Commonwealth,* 382 S.W.3d 851, 856 (Ky. 2012). Therefore, this Court must determine whether the trial court's decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945.

A trial court has "wide discretion when deciding whether to grant a motion for a continuance." *Taylor v. Commonwealth,* 611 S.W.3d 730, 735 (Ky. 2020). In reviewing a motion for a continuance, the trial court is tasked with considering the following factors: (1) length of delay; (2) any previous continuances; (3) inconvenience to the parties, witnesses, and counsel; (4) complexity of the case; (5) availability of other competent counsel; (6) whether the movant caused the need for a continuance; and (7) whether denial of the continuance would lead to identifiable prejudice. *Snodgrass v. Commonwealth*, 814 S.W.2d 579, 581 (Ky. 1991), *overruled on other grounds by Lawson v. Commonwealth,* 53 S.W.3d 534 (Ky. 2001).

In his motion for a continuance, Raehme argued the delay would be minimal – a few weeks or a couple months. Defense counsel admitted it wanted time to allow Dr. Bundy to furnish a more detailed analysis and have

23

Raehme further evaluated and tested. Once Dr. Bundy's evaluations and conclusions were complete, the Commonwealth would have then needed time to find its own expert to independently evaluate Raehme, review Dr. Bundy's report, and prepare to testify. Raehme asserts that the trial court merely speculated that the delay would be many months, but the trial court was likely correct. While the underlying criminal conduct occurred in September 2021 and the trial began in August 2022, less than a year after the incident, imposing a several month-long delay just days before trial would have been considerable.

Even though there were no prior continuances in the case, granting a continuance would have inconvenienced many witnesses, attorneys, and victims. There were several out-of-state witnesses who made travel arrangements and were preparing for trial, and the trial court was grappling with this issue a mere two weeks before the trial's scheduled start date. Additionally, the case was not particularly complex. The availability of other counsel was not at issue here. Further, the defense was at least partially to blame for the delay because, as the trial court pointed out, expert funds were granted in November 2021, approximately eight months before trial. The defense had the time and the funds to have Raehme evaluated months before the ninety-day deadline.

Finally, for the last factor, Raehme argues that the autism diagnosis would have provided a narrative to counter the Commonwealth's introduction of the Jefferson County incident and help the jury understand why Raehme

was more concerned with finding his driver's license than worrying about the victim after the collision. While a defendant is certainly entitled to counter the Commonwealth's proof, those efforts must be made in a timely and reasonable manner. It also bears noting that Raehme received the minimum possible sentence and has not shown prejudice from the denial of a continuance. As a result, we do not find that the trial court abused its discretion in denying Raehme's motion for a continuance.

**IV.    The Commonwealth did not commit any discovery violations.**

Raehme argues the Commonwealth committed discovery violations that substantially prejudiced him and deprived him of due process and a fair trial. First, he argues the Commonwealth failed to produce the basis of two expert witnesses' testimony about blood tests, and second, he argues the Commonwealth failed to produce a surveillance video showing the collision. These issues are preserved, and we review a trial court's evidentiary rulings for an abuse of discretion. *Ward,* 587 S.W.3d at 332. We must determine whether the trial court's decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."

The trial court entered a generalized discovery order requiring the Commonwealth to identify its experts and, among other things, the basis or grounds for each expert's opinion. On the first day of trial, Raehme filed a motion to exclude the testimony of the Commonwealth's experts, Deena Fletcher and Alycia Wilson, both forensic scientists with the Kentucky State Police who were expected to testify about the blood collected from Raehme and

25

the lab tests performed. Raehme objected to their testimony and argued the basis or grounds for the test results were not provided, which would inhibit his ability to effectively cross-examine them. The Commonwealth had merely given defense counsel a page of results. However, the Commonwealth noted that one of the results pages indicated that the testing method was "gas chromatography." The trial court deemed the reports sufficient.

The Commonwealth called Fletcher, who tested Raehme's blood for alcohol, as a witness and the trial court admitted the one-page report over defense counsel's objection. On cross-examination, Raehme inquired about gas chromatography, which is a separation technique. Fletcher explained that the testing produced chromatograms, or graphs, and those graphs had to be analyzed. When Fletcher pulled out one of the graphs, defense counsel asked to approach the bench and informed the trial court that this was precisely the information they sought in discovery. Ultimately, the blood test results were not excluded. This same scenario occurred with Wilson's testimony. Wilson was another Kentucky State Police scientist who tested Raehme's blood for the presence of drugs.

The Commonwealth also called Dr. Greg Davis who testified about the back extrapolation used to approximate Raehme's blood alcohol level at the time of the collision. A breathalyzer test was not performed at the scene of the collision because officers were concerned with the safety of everyone involved. Because the Commonwealth failed to turn over the graphs of the lab experts, the defense moved to exclude Dr. Davis's testimony as well.

26

RCr 7.24(1)(c) specifically states

> upon written request by the defense, the attorney for the
> Commonwealth shall furnish to the defendant a written summary
> of any expert testimony that the Commonwealth intends to
> introduce at trial. This summary must identify the witness and
> describe the witness's opinions, the bases and reasons for those
> opinions, and the witness's qualifications.

"[I]t is imperative that the Commonwealth provide full and timely discovery pursuant to RCr 7.24 . . . ." *Roberts v. Commonwealth,* 896 S.W.2d 4, 6-7 (Ky. 1995). Discovery allows a defendant the reasonable opportunity to inspect discovery materials. *Wright v. Commonwealth,* 637 S.W.2d 635, 636 (Ky. 1982). Raehme argues if he had been timely informed of the basis of the expert's opinions, he could have consulted with his own expert to examine the basis of the opinions, to assist in cross-examination of the Commonwealth's experts, and generally strengthen his defense.

The Commonwealth filed supplemental discovery on December 29, 2021 and that discovery included the Kentucky State Police lab report from the blood test for drugs. The report specifically includes that the drugs in Raehme's system were "detected by ELISA" and "confirmed by LC-MS/MS." A quick internet search reveals that ELISA stands for Enzyme Linked Immunosorbent Assay, a screening technique widely utilized by toxicologists to screen specimens for drugs,[2] and that LC-MS/MS stands for liquid chromatography-

---

[2] *ELISA,* CLEVELAND CLINIC, https://my.clevelandclinic.org/health/articles/ 24990-elisa (last updated May 15, 2023).

tandem mass spectrometry.[3]  Therefore the results of the drug test turned over by the Commonwealth included the type of testing performed.  While the report showing the blood alcohol test results is not in the record, during a hearing the Commonwealth stated that report was given to Raehme prior to the drug test results being turned over, and explicitly stated that the report included that the methodology was gas chromatography.  In addition, defense counsel specifically cross-examined Fletcher about gas chromatography.

Raehme also criticizes the fact that he had not seen the raw data the reports were based on.  But the Commonwealth did not deliberately withhold the information from the defense because the Commonwealth was not in possession of this raw data.  Here we cannot find a discovery violation for the Commonwealth failing to turn over documents it did not have.[4]  The Commonwealth turned over the blood testing results which included a sufficient basis for the experts' testimony.  Even if the Commonwealth failed to turn over required information pursuant to the trial court's discovery order, Raehme has failed to show a "reasonable probability that had the evidence been disclosed the result at trial would have been different."  *Stieritz v. Commonwealth,* 671 S.W.3d 353, 368 (Ky. 2023) (citation omitted).

---

[3] Hayk Snkhchyan and Edward J. Imwinkelried, *A New 'Gold Standard': LC/MS-MS Analysis in Driving under the Influence of Cannabinoid Cases*, Forensic Science Commentary, 57 No. 2 Crim. Law Bulletin ART 4 (Spring 2021).

[4] *See Slone v. Commonwealth,* No. 2013-SC-000446, 2014 WL 5410289, *6 (Ky. Oct. 23, 2014) ("The rules for discovery in criminal cases do not require the Commonwealth to disclose information it does not have.").

Based on the requirements of the trial court's discovery order, which was largely based on RCr 7.24(1)(c), we conclude that the Commonwealth did not commit a discovery violation as to the blood testing results. Because there was no discovery violation, the trial court did not err in allowing these experts to testify or admitting the reports.

Raehme also argues the Commonwealth committed a discovery violation for failing to turn over a surveillance video from a local business located near the collision, All About Kids. Raehme learned about this video after reviewing an officer's report that mentioned reviewing the video and recording it on his body cam. After jury selection, defense counsel realized the officer was not on the witness list and that it did not have the recording of the video. The parties discussed the issue with the trial court.

The Commonwealth explained that it did not have the video and was unsure as to why the video was not available. The Commonwealth learned that All About Kids still had the video and the next day, after a full day of witness testimony, obtained a copy and provided it to defense counsel. Raehme asserts that after viewing the video, he learned it was partially exculpatory because it showed the victim sped up and started to pass the vehicle in front of her, which is when Raehme collided with her. Raehme requested a mistrial and argued the Commonwealth should have exercised due diligence in obtaining the video.

The Commonwealth volunteered not to use the video given the circumstances of its late disclosure. Raehme's counsel chose to use the video,

29

in part because it showed the actions of another car near the collision which fit within the argument defense counsel wanted to make

The trial court acknowledged the evidence was likely mishandled but did not believe a discovery violation occurred because there was no evidence that the Commonwealth actually had the video in its possession. A proper sanction for events that transpired would have been to exclude the Commonwealth from using the video given its late disclosure. This was ultimately accomplished here because the Commonwealth voluntarily offered to not use the video. In a hearing conducted after the trial, the parties and the trial court learned more about what occurred. An officer used his body camera to record the All About Kids video from an iPad or similar device. That officer went to the police station and thought he successfully downloaded the video. The police records custodian later determined the video either did not download or was routinely erased after a standard period of time.

Raehme argues that because of the late disclosure of the video, he had to change strategies midstream, particularly in regard to the cross-examination of Detective Brian Washer. According to Raehme, Detective Washer, the accident reconstructionist, had not considered the actions of the third vehicle in his report. Defense counsel argued the third car likely affected Raehme's response or explained why he did not swerve to avoid the victim. Of course, Detective Washer stated he did not factor the surveillance video into his report because he had not seen it. Because Raehme moved for a mistrial, we review this issue

for an abuse of discretion. *Commonwealth v. Padgett,* 563 S.W.3d 639, 645 (Ky. 2018).

Raehme introduced the video during the testimony of Detective Brian Washer, the accident reconstructionist. Raehme received the video on August 3, 2022 and Detective Washer testified on August 5, 2022. Raehme argued that defense counsel did not have a reasonable opportunity to prepare. But Raehme was able to cross-examine Detective Washer and highlight any inconsistencies between what the video showed and what his report stated. The defense tried to attack the accident reconstruction report because it did not rely on the surveillance video, and during closing argument defense counsel tried to characterize the Commonwealth as hiding something by not showing the video to the jury itself. Raehme took advantage of being able to use the video and highlighting that the Commonwealth chose not to use the video.

Additionally, although Raehme asserts the surveillance video showed Tonya Kelly accelerating to pass the car in front of her, at which point she collided with Raehme, it does not affect the fact that Raehme was driving the wrong way down the divided highway or his state of mind. To the extent that the video was exculpatory, the jury viewed this evidence first-hand. There was no discovery violation.

31

**V. The trial court properly denied Raehme's motion for directed verdict on the wanton endangerment charge.**

At the close of the Commonwealth's case, Raehme moved for a directed verdict on the wanton murder charge, among other charges. The trial court denied his motion, and Raehme now argues the Commonwealth did not provide sufficient evidence for the jury to find that he acted wantonly under circumstances manifesting extreme indifference to human life.

Raehme argues that this error is preserved for review. In *Ray v. Commonwealth,* 611 S.W.3d 250, 266 (Ky. 2020), this Court explicitly delineated the requirements for preserving a directed verdict issue for appeal:

> [W]e now hold that in order to preserve an alleged directed verdict issue for appeal, <u>criminal defendants must</u>: (1) move for a directed verdict at the close of the Commonwealth's evidence; (2) renew the same directed verdict motion at the close of all the evidence, unless the defendant does not present any evidence; and **identify the particular charge the Commonwealth failed to prove, and must identify the particular elements of that charge the Commonwealth failed to prove.** Criminal defendants may move for directed verdict on one count of a multiple count indictment without rendering the alleged error unpreserved; defendants are not required to move for directed verdict on any lesser included offenses to a particular charge in order to preserve the issue; and, nor are they required to object to instructing the jury on that particular charge to preserve the alleged directed verdict error.

(Emphasis added).

Here, Raehme moved for a directed verdict at the close of the Commonwealth's case and at the close of all evidence, as required. However, Raehme merely stated that there was not "enough" to move forward to the jury on the wanton murder charge, among other charges. At the close of all evidence, Raehme simply renewed his motion. Raehme did not provide any

32

further detail or explanation as to which specific elements the Commonwealth failed to prove. As such, and based on the clear and concise rule set forth in *Ray,* Raehme's motion for directed verdict was insufficient to preserve this issue for appellate review.

Because this alleged error is unpreserved, we will only review for palpable error. "A palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." RCr 10.26. The error must be "so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Martin v. Commonwealth,* 207 S.W.3d 1, 5 (Ky. 2006). "A palpable error must be so grave that, if uncorrected, it would seriously affect the fairness of the proceedings." *Davis v. Commonwealth,* 620 S.W.3d 16, 30 (Ky. 2021) (citing *Ernst v. Commonwealth,* 160 S.W.3d 744, 758 (Ky. 2005)).

When presented with a motion for a directed verdict,

> the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky. 1991). On appeal, we must determine "whether, after viewing the evidence in the light most favorable

33

to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth v. Woods*, 657 S.W.3d 902, 906 (Ky. 2022) (quoting *Potts v. Commonwealth*, 172 S.W.3d 345, 349 (Ky. 2005)) (internal quotation marks omitted).

Despite not having made this argument before the trial court, Raehme argues to this Court that the Commonwealth failed to meet its burden of proving that Raehme acted wantonly under circumstances manifesting extreme indifference to human life. According to KRS 501.020(3), "[a] person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists."

A directed verdict is appropriate where the Commonwealth produces "no more than a mere scintilla" of such evidence. *Beaumont v. Commonwealth*, 295 S.W.3d 60, 68 (Ky. 2009) (quoting *Benham*, 816 S.W.2d at 188). Here, the Commonwealth produced more than a mere scintilla of evidence supporting the wanton murder charge. Raehme admitted to smoking marijuana the morning of the collision and eventually admitted to having more than one beer. Additionally, his blood alcohol level ranged between 0.69 and 0.74 nearly three hours after the collision and lab results revealed he had synthetic marijuana in his system. The Commonwealth also introduced the medical opinion of Dr. Davis, who opined that Raehme was intoxicated to some degree by the combination of marijuana and alcohol at the time of the collision. Multiple

34

officers and medical personnel smelled alcohol on Raehme and officers found drugs in his vehicle. In addition, he was driving the wrong way on a divided highway for about one mile– a highway he claimed he drove on often. Raehme also was not wearing his glasses, despite his driver's license stating he was required to do so. This constitutes more than a mere scintilla of evidence sufficient to submit the wanton murder charge to the jury.

Raehme points to cases in which he asserts the Court used a "drunkenness-plus" framework to resolve wanton murder cases, such as *Cook v. Commonwealth,* 129 S.W.3d 351 (Ky. 2004), in which the Court determined there was sufficient evidence for a jury to determine whether aggravated wantonness existed in a case involving evidence of both intoxication and excessive speed. In *Hamilton v. Commonwealth,* 560 S.W.2d 539 (Ky. 1977), there was evidence that the defendant operated a motor vehicle while intoxicated, drove with excessive speed, and ran a red light, and in *Walden v. Commonwealth,* 805 S.W.2d 102 (Ky. 1991), *overruled on other grounds by Commonwealth v. Burge,* 947 S.W.2d 805, 811 (Ky. 1996), the defendant operated a motor vehicle while intoxicated at a high rate of speed and crossed the center line. In both *Hamilton* and *Walden,* the Court found the defendants' conduct sufficient to support wanton murder convictions.

Raehme argues that evidence of impairment was not overwhelming because no tests were conducted at the crime scene, he did not exhibit obvious signs of impairment, and his blood alcohol level was not tested until several hours after the collision. But the evidence of impairment need not be

35

overwhelming to overcome a motion for directed verdict. Here, there was evidence that suggested intoxication and Raehme was clearly driving the wrong way on a divided highway. The Commonwealth also presented evidence that Raehme was speeding. The driver of another car testified that Raehme passed their vehicle while they were traveling at or just over the speed limit. All this evidence satisfies the requirements for overcoming a motion for directed verdict on the wanton murder charge. As such, the trial court did not err in denying Raehme's motion for directed verdict.

**VI.    The trial court did not abuse its discretion in allowing a witness to testify via Zoom.**

Raehme next argues that the trial court abused its discretion by allowing a witness to testify via a pre-recorded Zoom session. The Commonwealth made a motion to prerecord testimony from witnesses then show those recordings to the jury. First, the Commonwealth sought to record the testimony of Dr. Keith Miller, the victim's treating surgeon, because Dr. Miller had a pre-planned family vacation and was unable to attend the trial. Second, the Commonwealth sought to allow Nicole Day, an employee of the laboratory that tested Raehme's blood and a chain-of-custody witness, to testify via Zoom because she had COVID and her physician restricted her from traveling by plane.

On July 19, 2022, defense counsel objected to both motions, arguing that Raehme was facing a life sentence and had the right to cross-examine and confront any witnesses. Approximately one week later, the topic of pre-

36

recorded and Zoom testimony was again presented to the trial court. Defense counsel explicitly stated that she had no objection to Day's testimony being taken by deposition and played for the jury and expressly suggested that in the interest of judicial economy, these witnesses could testify remotely. Right before Day testified, Raehme again objected to the remote testimony. When the Commonwealth pointed out that defense counsel previously represented she assented to the remote testimony, defense counsel withdrew her objection.

In any event, the trial court overruled defense counsel's objection for public policy reasons because Day was infected with COVID. Public policy supported keeping her out of the court room and having the potential to infect others.

Although this is likely an issue of invited error, since defense counsel agreed to Day's remote testimony given that she was a chain-of-custody witness, we nonetheless find no error in the trial court admitting her remote testimony. In *Maryland v. Craig,* 497 U.S. 836, 857-58 (1990), the Supreme Court held that the right to face-to-face confrontation "may be abridged only where there is a 'case-specific finding of necessity.'" A defendant's Confrontation Clause rights may be satisfied without face-to-face confrontation "only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* at 850.

Raehme cites *Campbell v. Commonwealth,* 671 S.W.3d 153, 157 (Ky. 2023), in which this Court reversed a first-degree assault conviction because

37

the trial court allowed the treating physician to testify via Zoom. The doctor was served with a subpoena one day prior to his scheduled testimony, and his testimony was imperative because whether the victim suffered a serious physical injury was an essential element to the first-degree assault charge. *Id.* The Court concluded that the need to testify remotely amounted to a scheduling conflict, not a compelling need. *Id.* at 161.

In this case, Day was a chain of custody witness. While her testimony was valuable, it does not rise to the level of importance of the physician's testimony in *Campbell.* Further, Day did not testify in person due to COVID and travel restrictions imposed by her physician. This is a prime example of a public policy reason sufficient to justify a lack of face-to-face confrontation. While Raehme notes that Day's isolation period had ended, this does not necessarily mean it was safe or permissible for Day to travel interstate from Pennsylvania to Kentucky. Here, the testimony was pre-recorded for the jury and taken via Zoom. Raehme was able to cross-examine Day and had the ability to question her as to whether the lab she worked for is licensed in Kentucky, a fact that he now argues gave him serious concerns. Therefore, no confrontation violation occurred, and the trial court did not err by allowing Day to testify remotely and pre-record her testimony to play for the jury.[5]

---

[5] In the relevant facts section of his brief, Raehme also includes information about the trial court allowing Heidi Schimmelbusch and Dr. Miller to testify via in-person depositions conducted prior to trial. However, the argument section of his brief is entirely devoted to discussing Day's testimony. Therefore, we decline to address any perceived error in allowing Schimmelbusch and Dr. Miller to testify in this manner.

**VII.** **The trial court properly allowed witnesses to testify as to the victim's father's former position with Kentucky State Police.**

The victim's father, Dewan Kelly, is a retired Kentucky State Police trooper who served over twenty years. Prior to trial, Raehme filed a motion in limine to limit Mr. Kelly's testimony to leave out information about his occupation. The defense reasoned that the jury's knowledge of Mr. Kelly being a retired trooper could cause the jury to automatically trust Mr. Kelly, thereby causing undue prejudice against Raehme. The defense also noted the value of such evidence was insignificant. The trial court denied the motion, reasoning that introductory information about a witness is well-established and common practice.

This issue is properly preserved for our review and we review this admission of evidence for an abuse of discretion. *Mason v. Commonwealth,* 559 S.W.3d 337, 339 (Ky. 2018). During the guilt phase, the victim's sister testified that her dad is a retired trooper. During the penalty phase, Mr. Kelly discussed his twenty years of service as a state trooper and mentioned his experience as a state police officer two other times during his testimony.

The Commonwealth argues that Mr. Kelly's position as a retired state trooper constitutes background information about the victim, and that background evidence about a victim is generally admissible. *Ward v. Commonwealth,* 568 S.W.3d 824, 834 (Ky. 2019). We agree. The Commonwealth introduced evidence in the guilt phase that identifies a victim "as a living person rather than a simple statistic." *Ernst,* 160 S.W.3d at 763

39

(citing *McQueen v. Commonwealth,* 669 S.W.2d 519, 523 (Ky. 1984)). Such evidence does not become unduly prejudicial unless the victim is glorified or enlarged, or the evidence is used to arouse sympathy, *Ward,* 568 S.W.3d at 834, neither of which were done here. As a result, the trial court did not err in allowing witnesses to identify Mr. Kelly as a retired State Trooper.

## **CONCLUSION**

For the foregoing reasons, we affirm the judgment of the Hardin Circuit Court.

All sitting. VanMeter, C.J.; Bisig, Conley, Keller, Lambert, and Nickell, JJ., concur. Thompson, J., concurs in result only.


COUNSEL FOR APPELLANT:

Shannon Dupree
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Daniel J. Grabowski
Assistant Solicitor General